Good morning, Your Honors. Good morning. Mark Vanderhoof. Why don't you let the folks clear out behind you. It's a little cramped here. Okay. Thank you for morning. Mark Vanderhoof along with Stephanie Goldsboro from our office. Please talk into the mic. Sorry. On behalf of Mr. Lopez-Urenda who is in court here today, the issue in this case is whether the elimination of suspension of deportation contained in the 96-IRA-IRA enactment can be applied retroactively to Petitioner given the unique facts of his particular case. Petitioner applied for asylum on September the 6th, 1996 before IRA and the elimination of suspension and deportation were passed by Congress. And you're mindful, now you're trying to steer us around Vasquez-Zavala. Correct, Your Honor. It's very distinguishable and I'll explain why. When Petitioner applied for asylum, he relinquished his right to have the government carry its burden approving his deportability. And he did so in exchange for the right to apply for asylum and, if asylum were denied, to have a full deportation hearing subsequently where he would be able to apply for suspension of deportation. But three weeks after he did that, Congress enacted IRA, eliminating deportation proceedings, eliminating suspension of deportation and stripping him of his ability to do so. Instead, when his asylum application was denied one year later, he was placed in removal proceedings based on the concessions that he made in his asylum application and was told he was no longer eligible for suspension of deportation. Now, we believe this is distinguishable both from Vasquez-Zavala and this Court's prior decision in Jimenez and I'd like to explain why. Unlike Petitioner here, who filed his asylum application before Congress enacted IRA, Vasquez-Zavala filed his application in March 1997. IRA had already been enacted. The statute was clear. It wasn't going to go into effect for another three weeks, but it was clear that he was not going to be able to qualify for suspension of deportation when Vasquez-Zavala filed that application. He had no expectations. Vasquez-Zavala had no expectations whatsoever of being able to apply for suspension of deportation. Because of that, he didn't make the claims we make here. He didn't make the claims that he gave up important procedural and constitutional rights when he filed for suspension, nor did he make the claim that he had to settle expectation that he would be able to file for suspension of deportation, and thus the Court didn't address that issue whatsoever. Similarly, in Jimenez-Angeles, the Court said that all she did was give up her ability to live in the United States undetected when she reported to the INS and requested the issuance of an order to show cause. But again, she did that in March 1997, five months after or six months after IRA was enacted, fully aware that she would not be eligible to apply for suspension of deportation if INS put in proceedings after April 1, 1997. There was no obligation to do it. There wasn't a quid pro quo in either of those cases. I want to make sure I understand your argument, because Vasquez-Zavala relies and adopts Uspongo. Correct. Which is a Third Circuit case, which does talk about quid pro quo and says there wasn't any. So how do you – is that where you're headed? Yes, exactly. Okay, good. What the Third Circuit says in Uspongo is Uspongo gave up no rights when filing the petition for asylum and did not receive any benefits from having – and the government didn't receive any benefits from having – in file for asylum. That – in Uspongo, although the application was submitted prior to the enactment, the petitioner in that case simply did not make the argument to the Court, didn't present to the Third Circuit at all the statute, the regulations, and the warning on the asylum application. And so the Court didn't address this issue at all, and so that is not binding precedent on this Court. And it's very – it's very important. The Court made a – the Third Circuit made a big point of saying that no rights were given up. But in fact – You're skipping a step before you jump ahead there. You say, now, the Third Circuit – it wasn't argued in the Third Circuit. And it wasn't – Vasquez, which says the Third Circuit noted the uniqueness of St. Cyr's plea bargain quid pro quo situation and rejected any similar expectations, thereby adopting the quid pro quo rationale of Uspongo. And you're saying we should look beyond that because it wasn't argued in the Third Circuit. In either case, Your Honor. Factually, it couldn't have been argued. No, this is dictum. It couldn't have been argued in – in Vasquez-Zavala because it wasn't factually the same. Vasquez-Zavala applied only three weeks before. We didn't raise – This is a very, very important right that the alien gives up, and that's why they specifically said in enacting – in promulgating the regulations in December 1994, they said – and this is our opening brief at page 25 – the asylum application is often the only source of information available to the service to initiate proceedings before the immigration judge. And on page 27, similarly in that preamble to the regulation, the Department believes that the alien's written admission of alienage and of having no lawful status in the United States is sufficient to satisfy the standard of evidence for establishing deportability. Consequently, the new asylum application will contain a warning, clear warning, that the application may be used to establish deportability. This part of the final rule will not be applied retroactively and will affect only those persons who make an application on the new form. And they did that because they said this is such an important right the person is giving up. When they apply for asylum, they are – we are now changing the regulations. Before, they could not use that information under ACFR 242.17. They couldn't use that information. In December 1994, they changed the regulation. They said from here on in, anyone who applies for asylum is going to give up their very important right to have the government meet its burden of proof, improving deportability. And because it's so important, we're going to put a warning on there telling them that. And that warning is contained in the excess of record at 7, which is the asylum application that we submitted. Did Mr. Lopez-Urender lose something very important in this bargain when he wasn't allowed ultimately to file for a suspension? Absolutely. The immigration judge, in ruling that she felt she was without power to allow him to file for suspension, said, had this respondent been eligible for relief in removal proceedings, either through suspension of deportation or cancellation of removal, he would have been a good candidate for that relief and appears to be a person who would contribute to this country in a meaningful and positive way. So it is with some distress and a great deal of empathy for the respondent that the court feels it must go forward at this point and grant the only relief available, voluntary departure. He has two U.S. citizen children. He's been here for years. He gave up important rights when he filed for his asylum application, thinking if denied he could file for suspension of deportation, would have been granted based on what the immigration judge says, and that was stripped of him three weeks later. We think under Supreme Court's decision on Lange's behalf and in St. Cyr, it falls right within that and is distinguishable from Vasquez, Zavala, Fajimedes, and Usbongo, and I'll reserve the rest of my time. Thank you. All right. Thank you. May it please the Court. My name is Anne Tumeyer. I present the Attorney General. Contrary to petitioner's claims, Vasquez, Zavala, as well as Fajimedes and Usbongo do control this case because Ira-Ira governs his proceedings, and he has no settled expectation. The distinctions that he raises are two, and both are unavailing. The first distinction is that he was not aware of the existence of Ira-Ira at the time that he submitted his asylum application, whereas Vasquez was aware of it and submitted his application just prior to the effective date, and there's a distinction there. Well, that's an insignificant distinction when this Court said in Vasquez that the basis for its decision in dismissing the petition was because it was the fact that he had no settled expectation as to whether his application would be denied, and even if it were denied, he had no expectation as to when the proceedings would commence. The emphasis is on the timing of the proceedings. Petitioner suggests that Vasquez actually had an expectation as to the timing of the proceedings, and that is completely erroneous. Therefore, the distinction is insignificant. Now, the second distinction that he makes is that he did have a settled expectation, that he had initiated some sort of formal exchange which was comparable to that of St. Cyr, and that is flawed. There was no formal exchange like that of the plea bargain in St. Cyr, and this Court has already stated so in Jimenez and Vasquez, and the Third Circuit says so in Eusbango. There was no loss of a right and there was no gain by either side. Here, as far as Petitioner is concerned, he did not give up any protected right. He does not have a right to make the government sustain its burden of proof. The burden of proof is required. In fact, in this case, the government still had to sustain its burden of proving his alienage. And I would point out that the basis for finding him deportable was not any information obtained from his asylum application. Rather, it was his own admissions during the removal proceedings. At that time, he cannot argue that he was not aware he was not subject to removal proceedings and the law as it existed. He knew and he conceded that he was subject to removal. So there was no right that he gave up. He also did not, even if he gave up some sort of right, he did not do so to gain a benefit. There was no benefit for him to gain. He was placed in proceedings and he had submitted his asylum application in 1996. He entered the U.S. in 1990, March 1, 1990. That means that he would have had to have some sort of expectation that the INS would That means that he had some sort of expectation as to when the proceedings would have commenced. This court has already stated that the alien has no such expectation. So, therefore, he could not have gained anything. In addition to that, as he acknowledges in his letter brief at page 6, and St. Cyr has stated, he would have had to have been eligible for the form of relief he's seeking at the time that he submitted his asylum application. He wasn't. And the government also did not lose anything nor did it gain much of anything that would have been contemplated by St. Cyr. The government basically did not induce him to do anything. By voluntarily submitting himself and his application for asylum, the government did not force him to do anything and they didn't gain it because they still had to establish his alienage. And as stated earlier, he gave up that evidence on his own accord. He voluntarily did so. And the government, if anything, gained a limited benefit in limiting some of its resources or prosecutorial resources. But as this court stated in Vasquez, that is not the kind of gain that the government received that would have been contemplated by St. Cyr. As a result, there really is no distinction between Jimenez and Vasquez, and this court is required to dismiss this case. Okay. Judge Gibson, did you have any questions? No questions. Thank you. A couple of responses, Jimenez. I would refer the Court, excuse me, to our letter brief on Vasquez-Zavala. I think it's clearly distinguishable and I would urge the Court to look at that again. I think this is clearly distinguishable from Vasquez-Zavala because of the fact that, excuse me, when he applied, he did not know that the law was going to be changing, obviously. And the government said, we're going to warn you about this because you are giving up very important rights. Because of that, this is really, we believe, is controlled by St. Cyr. It was pretty much the same situation there. In St. Cyr, the individual in pleading guilty allowed the government not to have to sustain its burden of proof in that case. And similarly here, there is a concession of deportability, essentially, in the information provided, and that's set forth in the regulations and in the warning on the application. There was definitely an exchange here, and he did give up something very important. I would like to clarify, though, that this is not a situation contrary to what the government attorney argues. You might clarify for me what it was that he gave up. The government has the burden of proving elements of deportability and including alienage. And what the ---- Was the alienage aspect of it that was given up? Correct, Your Honor. He ---- Or anything else? Well, that's the essential ---- Well, the whole fact that he was from another country was unlawfully in the United States. And the warning and the regulation says that, that that's an important thing that the government has to prove, and the immigrant in filing for asylum ---- So being really any problem of proving alienage? There often is, Your Honor. We cited the Ramon Sepulveda case of the circuit to the Court where alienage was the only issue in that case. The government couldn't prove ---- This case. Pardon? About this case. Correct. Would there be a problem in this case? Well, yes, Your Honor, because there would have been a problem. He came forward and gave the information to the ---- He told that. But if he hadn't done that, then what? If the INS had somehow come across him in some other way, you mean? Well, that's a different thing as to whether he's discovered or not. But that isn't what you're arguing. It's that he came forward and was therefore discovered. You're arguing that he gave up the problem that the government might have in proving alienage? Correct, Your Honor. He certainly did give up as far as being discovered. But I don't think that's a basis on which you're arguing or could argue. Well, the warning on the asylum application is very specific about that. And in the preamble to the December 1994 regulations, which we cite in our brief, the Department of Justice was very specific that the alien was giving up an important right in having the government not having to prove alienage and deportability. How is this different from Jimenez? It's different in Jimenez because the individual did not file for asylum, wasn't forced to give up her right in ---- She came forward and the opinion says, well, that doesn't rise to the level of St. Cyr. Correct, but that's very different because there wasn't a quid pro quo. Here the individual is allowed to file for asylum by regulation, is compelled to give up her right to have the government prove deportability. She knows, or he knows, that if denied asylum, he would be placed in deportation proceedings and would be giving up his right to have the government prove its ---- meet its burden of proof, which is a very, very important right in a deportation proceeding. The Supreme Court has said it wouldn't ---- The irony of it is, is that in all probability that if he had not filed for asylum, that he wouldn't have been discovered by the time the 10 years was up, which appears to be the case. That's ---- But I'm not sure that's something we can take into account as to the discovery aspect. Well, you can, and I know where the Court's going with this, did Jimenez Angeles cover that issue, and we think not. And the reason is Jimenez Angeles didn't involve the issue of coming forward and applying for asylum. And that's a very important difference. Jimenez Angeles just said, I knock on the door of INS, I said, here I am. Please put me in proceedings in the next three weeks so I can qualify before the law changes. And the INS, you know, basically didn't do that. And the Supreme Court in ADC has said, you know, there's no ability to force the INS to do it on the timing. We're not raising a timing issue here. We're not raising that the government had an obligation to put him in proceedings before April 1st, 1997 at all. We're saying when he applied for asylum, he had the expectation that he'd be eligible for suspension of deportation. He gave up his right to have the government prove deportability by clear, convincing and unequivocal evidence, as it has to and it would be, and then that was stripped away from him three weeks later. So we do think this falls within St. Cyr and is not bound by Vasquez at all. All right. Thank you very much. The case that's argued will be submitted.
judges: Hug, Gibson , Fisher